UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-154-TBR

CHARLES WEST,                                                                    PLAINTIFF

v.

PELLA CORPORATION,                                                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Pella Corporation's Motion for Summary

Judgment, [DN 20.] Plaintiff Charles West responded, [DN 22], and Pella Corporation replied,

[DN 23.] Fully briefed, this matter is now ripe for adjudication. For the reasons set out below,

Pella Corporation's motion for summary judgment is **DENIED**.

## BACKGROUND

This matter arises out of Plaintiff Charles West's employment with Pella Corporation

("Pella") at its manufacturing plant in Murray, Kentucky. West was employed by Pella from

March 2004 until his termination in February 2015. [DN 22-1 at 7 (West Deposition).]

According to Pella, West had a history of attendance issues throughout his employment. [*See* DN

20-1 (Pella's Motion for Summary Judgment).] In April of 2005, West applied for and was

granted FMLA leave after he suffered from severe gum disease that required a large amount of

dental work, including the extraction of his teeth. [DN 22-1 at 22.] However, according to West,

Pella provided him with the paperwork, he "just filled in the blanks, and they told me to give it to

the doctor, and he filled in the rest." [*Id.* at 23.] West further explained in his affidavit that,

during that period of leave, he called into work every day and told his supervisor that he would

not be able to work. [DN 22-3 at 1 (West Affidavit.)] West stated that, after he called in every

1

day for several weeks, Pella sent West the FMLA paperwork to be completed by West and his dentist. [*Id.* at 2.] In other words, West stated that he "did not ask for the paperwork, and did not know or understand that it was FMLA paperwork." [*Id.*]

In June of 2014, West injured his back at work while lifting heavy windows. [DN 22-1 at 11.] West did not immediately visit a doctor for his injury, but testified that he was taking Ibuprofen, which helped him get through his shifts, "until it got worse" about two weeks later. [*Id.* at 12–13.] West began calling in sick for work on June 9, 2014, and continued to call in every day until he returned to work on August 26, 2014. [DN 20-11 at 2 (Jeremy Phillips Affidavit).] Each day, West stated that he could not work due to back pain or spasms. [*Id.*] West explained in his affidavit that, by calling in every day to report that he was not feeling well enough to work, he followed the same procedure as he had in 2005 when he was absent due to his extensive dental work. [DN 22-3 at 2.]

West testified that he visited a primary care physician about two weeks after he began his absence from work. [DN 22-1 at 14–15.] That visit took place on June 26, 2014, and resulted in diagnoses of lumbago and muscle spasms. [DN 20-24.] Additionally, West's provider prescribed multiple medications. [*Id.*] After that visit, West went into Pella to provide the doctor's note from that visit to Jeremy Phillips, Pella's human resources manager. [DN 22-1 at 19–20.] According to West, at that time, Phillips provided him with contact information to apply for short-term disability benefits. [*Id.* at 20.] Though Phillips averred in his affidavit that West received both short-term disability and FMLA leave paperwork, [DN 20-11 at 2], West testified in his deposition that Phillips only ever told him about short-term disability, and only every provided him with a phone number to call, rather than paperwork. [DN 22-1 at 18.] West did apply for short-term disability, but his application was denied because his "doctor's notes didn't

cover the entire time that [he] was out" from work. [*Id.* at 20.] When asked whether West ever applied for FMLA leave during his absence, West responded "I didn't know anything about it." [*Id.* at 21.] The parties agree that West never filled out an application for FMLA leave relating to his June 9 to August 25, 2014 absences.

According to West, sometime in July, his manager, Johnny Phillips, contacted him and told him that, since he had been out from work, he needed to go back to the doctor. [*Id.* at 15–16.] On July 31, 2014, West returned to the same primary care provider he saw at his previous visit. [DN 20-25.] At that visit, West's doctor performed an x-ray, which revealed severe arthritis, in addition to his other diagnoses of degenerative disc disease and lumbago. [*Id.*; DN 22-1 at 17.] The doctor prescribed West multiple medications. [*See* DN 20-25.]

When West returned to work on August 26, 2014, he received two disciplinary letters, called "Class 3 Corrective Action Letters," related to his absence from June 9 to August 25, 2014. Both letters are dated June 25, 2014. [DN 20-13; DN 20-14.] The first Corrective Action Letter was issued due to West's failure to report for mandatory overtime on June 14 and June 21, 2014. [DN 20-13.] The second Corrective Action Letter was issued due to "excessive absenteeism" from June 9, 2014 to June 25, 2014. [DN 20-14.] Both letters warned West that "receiving three Class 3 Corrective Action Letters in a one-year period will lead to the termination of your employment." [DN 20-13; DN 20-14.] West testified that he was told to sign both letters (which he did), or that he would be terminated. [DN 22-1 at 27.]

West testified during his deposition that, after he received the two Corrective Action Letters upon his return to work on August 26, he informed Pella that he would "be on medication for the rest of [his] life" due to his back issues. [*Id.* at 44.] However, West did not discuss with Pella representatives what type of medication he was on. [*Id.* at 45.]

Pella's records indicate that West next called in sick for five consecutive workdays in February 2015. According to Pella, West called in sick on February 4, 5, 6, 9, 10, and 12. [DN 22-1 at 29–30.] West's manager at that time, Tony Robinson, stated that, each day West called in on February 4, 5, and 6, that West requested vacation for those days. [*Id.* at 30.] Robinson stated that he approved West for vacation, but that on the third day, he charged West with an attendance incident for failing to request the vacation in advance as required by Pella's policy. [*Id.* at 31.] Pella next claims that West called in sick on February 9 and 10 after he ran off the road and his truck got stuck in the mud. [*Id.* at 31–32.] Finally, Pella's records indicate that West also called in sick on February 12, 2015 for "personal business." [DN 20-20.]

West agrees that he called in sick on February 9 when his truck was stuck, but denies ever calling in sick on February 4, 5, 6, 10, or 12. [*Id.* at 30–32.] According to West, he "was only out one day" in February. [*Id.* at 33.] According to Phillips, on February 10, 2015, West was formally counseled over the phone about his absences and tardiness at work. [DN 20-11 at 3.] However, West testified that he could not recall this phone conversation ever taking place. [DN 22-1 at 35–36.] West agreed, however, that after he was absent for his truck breaking down, Pella called to inform him that he was suspended for absenteeism. [*Id.* at 37–38.] According to West, he was already suspended before February 12, 2015, when Pella claims West called in sick due to "personal business." [DN 22-1 at 41.]

Pella sent West a letter via certified mail dated February 12, 2015 stating that West received a third Class 3 Corrective Action Letter on February 12, 2015 for "excessive absenteeism/tardiness' and that he was discharged from employment at Pella that same day for receiving three Class 3 Corrective Action Letters in a twelve month period. [DN 20-20.] According to Pella, Jeremy Philips met with West on February 13, 2015 to discuss his attendance

issues. [DN 20-11 at 4.] Philips states that he asked West whether "there was an underlying reason for the absences that [Pella] could address though Pella's employee assistance program, and Mr. West answered no and mentioned that his absences were caused by 'other stuff that keeps happening.'" [*Id.*]

Under Pella's Attendance Policy, unexcused absences constitute "occurrences," and the time employees miss from work count toward the calculation of an "absenteeism rate %." [DN 20-5 at 1.] Pella's Policy explains that an employee's attendance record will be considered "unacceptable" when an employee incurs four or more occurrences or has an absenteeism rate of 2% or higher, whichever occurs first in a rolling twelve-month period. [*Id.* at 2.] According to Pella, because West's attendance record violated its attendance policy, and because West received three Class 3 Corrective Action Letters in a one-year period, it determined that West was properly terminated under the progressive discipline process outlined therein. [DN 20-11 at 5.] Pella sent a termination letter to West on February 18, 2015 formalizing his February 12, 2015 discharge. [*Id.*]

West brought suit against Pella, asserting, relevant to the instant motion, claims of FMLA interference and FMLA retaliation. [DN 15 (First Amended Complaint).]

STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining

whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Though West asserted a total of six claims in his amended complaint, [DN 15], in his response to Pella's motion for summary judgment, West indicated that he is abandoning all but

two of those claims. Herein, West only opposes summary judgment with regard to his claims under the Family Medical Leave Act (FMLA). [DN 22 at 1–2 (West's Response).]

"The FMLA entitles qualifying employees up to 12 work weeks of leave under specified circumstances, including if they are suffering from a serious health condition." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (citing 29 U.S.C. § 2612(a)(1)(D)). The Sixth Circuit "has recognized two theories of recovery under the FMLA: interference and retaliation. *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)). In this case, West brings claims under both theories.

## A. FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "[A]n employer violates the FMLA under the 'interference' theory if it fails to provide its employee with his FMLA entitlements or interferes with an FMLA-created right, regardless of the employer's intent." *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 496 (6th Cir. 2016) (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

Employees can prove claims of FMLA interference using the *McDonnell Douglas* burden-shifting framework. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 427 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Under that framework, "the employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Id.* (citing *Donald v. Sybra, Inc.,* 667 F.3d 757, 761–62 (6th Cir. 2012)).

### (1) Prima Facie Case

In order for West to make out a prima facie case of FMLA interference, he "must show that: (1) he was an eligible employee; (2) [Pella] was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified [Pella] of his intent to take leave; and (5) [Pella] denied him benefits or rights to which he was entitled under the FMLA." *Id.* (citing *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 506 (6th Cir. 2006)). Here, Pella does not dispute that West was an eligible employee and that Pella was a covered employer under the FMLA. [DN 20-1 at 27.] However, according to Pella, West cannot prove the remaining three elements. [*Id.*]

#### a) Serious Health Condition

With regard to the third element, Pella argues that West was not entitled to take FMLA leave because he did not have a serious health condition. [DN 20-1 at 27–28.] The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves--**(A)** inpatient care in a hospital, hospice, or residential medical care facility; or **(B)** continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Here, West does not allege that he received any inpatient care, but rather alleges that he received continuing treatment by a health care provider. [DN 22 at 14.] Specifically, West argues that his chronic arthritis and lumbago constitute a "chronic serious health condition" as defined in 29 C.F.R. § 825.115(c).[1] Under that section, "[a] serious health condition involving continuing treatment by a health care provider includes" the following:

---

[1] Pella argues that West does not meet the requirements for a serious health condition relating to incapacity and treatment as defined under § 825.115(a) because West failed to prove that he experienced a period of incapacity of more than three consecutive days and because he was not treated the required number of times. However, as West does not argue that subsection (a) applies to him, and instead argues that he meets the requirements for a serious health condition as outlined in subsection (c) of §825.115, the Court need not address the applicability of subsection (a).

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c)(1)–(3). Under § 825.113(b), "[t]he term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.115(b). Section 825.113(c) provides that "[t]he term treatment includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.113(c). "A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen)." *Id.* Courts within the Sixth Circuit have held that "[w]hether an illness qualifies as a serious health condition under the FMLA is a legal question which the court must determine." *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 849 (W.D. Tenn. 2010) (quoting *Alston v. Sofa Express, Inc.,* No. 2:06–CV–0491, 2007 WL 3071662, at *8 (S.D. Ohio Oct. 19, 2007)).

According to West, his diagnoses of lumbago, muscle spasms, sacroiliac joint (SJ) arthritis, and degenerative disc disease (DDD) constitute a chronic serious health condition qualifying him for FMLA leave. [DN 22 at 14–15.] During his period of absence from June 9, 2014 to August 25, 2014, West visited a health care provider twice. The first visit occurred on

Thursday, June 26, 2014. At that visit, Dr. Susan Heffley, MD, diagnosed West with lumbago and muscle spasms. [DN 20-24 at 2.] She prescribed thirty days' worth of Diclofenac Sodium, Medrol and fourteen days' worth of Zanaflex. Dr. Heffley stated that West would be out of work on June 27 and June 28, but that he could return on June 30. [*Id.*]

The second visit took place on July 31, 2014. At that visit, Dr. Heffley identified West's diagnoses as SI joint arthritis, DDD, and lumbago. [DN 20-25 at 2.] She prescribed him another thirty days' worth of Diclofenac Sodium, thirty days' worth of Zanaflex, and discontinued West's use of Medrol. [*Id.*] Under West's plan of treatment, Dr. Heffley wrote that West could return to work on Monday, August 4, 2014 and that she "explained that this will be a chronic condition that will flare up from time to time." [*Id.* at 3.] In his deposition, West stated that he would "be on medication for the rest of [his] life." [DN 22-1 at 44.]

By visiting Dr. Heffley once in June 2014 and once in July 2014, West meets the "[r]equires periodic visits (defined as at least twice a year) for treatment by a health care provider" element of a chronic serious health condition. *See* 29 C.F.R. § 825.115(c)(1). Next, because, as Dr. Heffley wrote in West's records, West's back issues would "be a chronic condition that will flare up from time to time," West also meets the second and third elements requiring that the condition "[c]ontinues over an extended period of time (including recurring episodes of a single underlying condition)" and that the condition "[m]ay cause episodic rather than a continuing period of incapacity." *See* 29 C.F.R. § 825.115(c)(2)–(3). Moreover, the fact that Dr. Heffley prescribed West with medications after each visit further demonstrates that he was undergoing continuing treatment, which includes "for example, a course of prescription medication (e.g., an antibiotic)." 29 C.F.R. § 825.113(c). Additionally, the fact that Dr. Heffley explicitly designated West's condition as "chronic" and specified that it would continue to "flare

up from time to time" demonstrates West's need for continuing treatment, including continuing medication, and potential further absences from work in the future.

In opposition to a finding that West suffered from a serious health condition, Pella argues, first, that Dr. Heffley only prescribed West one months' worth of prescriptions at each visit and did not prescribe refills. However, Dr. Heffley prescribed West additional prescriptions at the July 31 appointment, during which she also informed West that his condition would continue to flare up, which indicates that she would continue to prescribe him with new prescriptions as needed.

Second, Pella emphasizes the fact that, after each visit, both of which occurred on a Thursday, Dr. Heffley indicated that West could return to work the following Monday. True, West never did return to work at any time between June 9, 2014 and August 25, 2014. According to Pella, the fact that West did not provide medical documentation for his absences from June 9 to June 26, July 1 to July 30, or August 4 to August 26 demonstrates that West was not incapacitated and therefore that was not suffering from a serious health condition. The Court disagrees. The Sixth Circuit has made clear that "[a]bsences attributable to a chronic serious health condition . . . qualify for FMLA leave even if the employee or family member does not receive treatment from a health care provider during the absence." *Perry v. Jaguar of Troy*, 353 F.3d 510, 515 (6th Cir. 2003); *see also* 29 C.F.R. § 825.115(c) (requiring only "periodic visits (defined as at least twice a year)."). This is different from a serious health condition due to incapacity and treatment under § 825.115(a), which does require specific amounts of treatment by health care providers within certain time periods. 29 C.F.R. § 825.115(a)(1)–(4). Though a chronic serious health condition "[m]ay cause episodic rather than a continuing period of

incapacity," this is a permissive, rather than mandatory requirement, meaning that the statute contemplates both episodic and continuing periods of incapacity.

Accordingly, the fact that West does not have medical documentation for his entire period of absence does not render him ineligible for FMLA leave due to a chronic serious health condition. In the Court's view, it is sufficient that Dr. Heffley characterized West's back problems as chronic and continuing. This, combined with the facts that West satisfies all three elements for chronic serious health condition, leads the Court to conclude that West was eligible for FMLA leave. Here, West sought medical attention on more than one occasion, was administered multiple prescription medicines, and indicated to Pella that he was not well enough to work for several weeks in a row. *Contra Bauer v. Dayton-Walther Corp.*, 910 F. Supp. 306, 310 (E.D. Ky. 1996), *aff'd sub nom. Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109 (6th Cir. 1997) ("Nor did Bauer suffer from a 'chronic serious health condition' as defined in the regulations. Bauer sought medical attention on only one occasion due to his condition. Apparently, no treatment of this condition was ever administered. Moreover, Bauer's condition did not present the sort of episodic period of incapacity contemplated . . . his condition caused him only to miss work one full day and leave early twice").

### b) Notice of Need for FMLA Leave

With regard to the fourth element of West's prima facie case, Pella asserts that West never notified Pella of his intent to take FMLA leave. [DN 20-1 at 29.] In determining whether an employee provided its employer with adequate notice of his need for FMLA leave, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) (quoting *Brohm v. JH Props., Inc.,* 149 F.3d

517, 523 (6th Cir. 1998)); *see also Reeder v. Cty. of Wayne, Michigan*, 694 F. App'x 1001, 1006 (6th Cir. 2017) (Explaining that an employee "will be deemed to have given the employer sufficient notice by providing information from which the employer can reasonably conclude that an FMLA-qualifying circumstance is in play."). To do so, "the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). Rather, "it is incumbent on the employer—if more information is needed to determine whether the condition is FMLA-qualifying—to require, *by written notice*, certification by a health-care provider." *Reeder*, 694 F. App'x at 1006 (citing *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014)). In other words, as the Sixth Circuit has explained, "[t]he employee's burden is not heavy." *Wallace*, 764 F.3d at 586. "[W]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 724 (6th Cir. 2003)). Moreover, it is not enough for an employer to *only* request a certification from a health care provider; rather, the employer also has a duty to "advise the employee and 'shall state in writing what additional information is necessary'" in that certification. *Reeder*, 694 F. App'x at 1006 (quoting 29 C.F.R. § 825.305(c)).

In *Cavin*, for example, the Sixth Circuit found that a genuine dispute of material fact existed as to whether the employee provided adequate notice of his need for FMLA leave. *Cavin*, 346 F.3d at 724. There, the employee claimed that he "called security on the day of his motorcycle accident to inform Honda of his absence . . . He told security that he expected to return to work the following day, but after receiving treatment from another doctor Cavin called in absences for several additional days on a daily basis." *Id.* According to the employer, Honda, however, the employee

> only "told the security desk that he had been in an accident, could not work that
> day, and would be back at work the next day." Honda notes that Cavin never
> requested leave, did not state that he would need to miss work for an extended
> period, and failed to provide any other information that might lead Honda to
> conclude that Cavin was experiencing a "serious health condition" for FMLA
> purposes.

*Id.* As a result, the court found that there was "[c]learly . . . a disputed issue of material fact as to

the content of the notice Cavin gave Honda." *Id.* Similarly, in *Reeder*, the Sixth Circuit

concluded that "three notes of health-care providers certifying that [the plaintiff] was unable to

work in excess of eight hours per day" was sufficient to "create a genuine question for the jury as

to whether [the plaintiff] had given the [employer] sufficient notice that he was subject to an

FMLA-qualifying condition that would excuse him from mandatory overtime work." *Reeder*,

694 F. App'x at 1006.

Here, West testified that he informed his manager, John Moon, that he pulled his back out

at work when lifting heavy windows. [DN 22-1 at 11.] Both parties agree that, beginning on June

9, 2014 and until August 25, 2015, West called his manager every day to report that he could not

work due to back pain or spasms. [DN 20-11 at 2; DN 22-3 at 2.] West stated in his affidavit that

he decided to call in every day during that time because he had done the same thing in 2005

relating to his dental work. [DN 22-3 at 2.] West also provided Pella with his doctor's notes from

June 26 and July 31, 2014. [DN 20-11 at 3.] Therein, Dr. Heffley indicated that West had various

diagnoses, including lumbago, muscle spasms, SI joint arthritis, and DDD. [DN 20-24; DN 20-

25.] Moreover, according to West, in July, his then-manager, Johnny Phillips, contacted him and

told him that, since he had been out from work for an extended period, he needed to go back to

the doctor. [DN 22-1 at 15–16.] This led to West's second visit on July 31, 2014. [DN 20-25.]

This evidence, taken in the light most favorable to West, could suggest that Pella had notice of

West's back injuries and that it recognized his need for further medical care and treatment. This,

in turn, would have triggered Pella's duty to gather more information and require a certification from West's health care provider. In sum, the Court finds that there are genuine factual disputes as to whether West met his burden of providing Pella with adequate notice of his need for leave due to an FMLA-qualifying condition.

### c) Denial of Benefits or Rights under the FMLA

With regard to the fifth element of West's prima facie case, Pella contends that, because West never gave it notice of his need to take FMLA leave, that it could not have denied him any FMLA rights or benefits. [DN 20-1 at 29.] "A benefit is denied if an 'employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave.'" *Tennial*, 840 F.3d at 308 (quoting *Arban*, 345 F.3d at 401). Here, because the Court finds that a genuine dispute exists as to whether West provided Pella with adequate notice of his need for leave, the Court likewise finds that the issue of whether Pella interfered with such leave is also in genuine dispute. Specifically, there is a genuine dispute about whether Pella met its obligation to "obtain any additional required information [from West] through informal means," 29 C.F.R. § 825.303(b), to require a certification from a health-care provider, and to counsel West about the consequences of an inadequate certification. For instance, though West testified that Pella provided him with and instructed him to complete FMLA forms in 2005, he denies that they did the same in 2014. Taken in the light most favorable to West, the Court finds that a factual dispute exists as to whether Pella interfered with West's FMLA rights. Therefore, West has raised genuine disputes of material facts as to the fourth and fifth elements of his prima facie case.

### (2) Legitimate, Nondiscriminatory Reason

As the Court explained above, genuine disputes of material fact exist as to the fourth and fifth elements of West's prima facie case for FMLA interference. However, according to Pella,

even if West can make out a prima facie case for FMLA retaliation, it had a legitimate, nondiscriminatory reason for terminating him, in which case it can still prevail on summary judgment. Specifically, Pella claims that it terminated West's employment on the legitimate, nondiscriminatory basis that he missed work on February 4, 5, 6, 9, 10, and 12, 2015, which violates Pella's company Attendance Policy and was grounds for West's termination. [DN 20-1 at 15; DN 20-15 (Pella Weekly Attendance Activity Report); DN 20-17 (Payroll Records); DN 20-18 (Attendance Records).] According to Pella, West received one occurrence for missing February 4, 5, and 6, another for missing February 9, a third for missing February 10, and a fourth for missing February 12. [DN 20-1 at 9–10.] In total, this resulted in four additional occurrences in February 2015. Under Pella's Attendance Policy, "[a]n employee's Attendance Performance will be considered unacceptable" when an employee has "4 or more Occurrences **or** 2% higher Absenteeism Rate whichever occurs first in the last 12 months." [DN 20-5 at 2.] True, the Sixth Circuit has held that "a poor attendance record" can serve as a legitimate, nondiscriminatory reason for termination. *Harris v. Circuit Court, Clerk's Office, Metro. Nashville*, 21 F. App'x 431, 433 (6th Cir. 2001). According to Pella, then, it was justified in terminating West for his four February 2015 absences, separate and independent from West's absences from June 9 to August 25, 2014.

However, the Court finds Pella's argument to be unpersuasive for two reasons. First, West denies having missed work at all in February with the exception of the one day on which he called in when his truck was stuck in the mud. According to West, that was the sole day of work he missed in February 2015. At his unemployment hearings, which both parties reference in their pleadings, West testified that he had been charged with training another employee and, by early February, that new employee was finished being trained so his lead, Kyle, "kept sending [him]

home every day . . . "[b]ecause he didn't need [West] on the line." [DN 22-15 at 42 (Transcript of Unemployment Hearing).]

Pella, on the other hand, points to a letter West wrote to the Kentucky Unemployment Insurance Commission (KUIC), in which he wrote "In February, 2015 I was out of work because I was sick, and I also had car trouble." [DN 20-22 at 1.] Then, in his brief titled "Appellant's Summary Statement" before the KUIC, West's counsel wrote "On February 6, 2015, Mr. West missed work because he was sick." [DN 20-23 at 3.] While this may tend to show that West admitted to missing work on February 6, he still disputes that he missed work on February 4, 5, 10, and 12.

Pella also contends that its attendance and payroll records created contemporaneous to West's alleged absences corroborate the fact that West was gone on those dates in February. [*See* DN 20-15; DN 20-16.] However, the Weekly Attendance Activity Report only shows West as having been "out" on February 7, but none of the other February dates. [DN 20-16 at 3.] This is odd in light of the fact that Pella does not assert that February 7 was one of the days West was absent in February. Pella's Payroll Records for February, however, indicate that West took vacation on February 4 and 5, was out due to "sick/injury" on February 6, and was out on "personal business" on February 9 and 10, 2015. The records do not appear to address February 12, however.  [*See* DN 20-16).] Though these payroll records may tend to corroborate Pella's claims that West indeed missed multiple days of work in February, the Court finds that West's assertions to the contrary, along with his claim that he was sent home early many of those days, are nonetheless sufficient to create genuine disputes of fact as to his February absences.

However, the Court also finds Pella's proffered legitimate, nondiscriminatory reason to be insufficient for a second reason. In detail, though Pella claims it could have legitimately

terminated West based solely on his February absences, it does not appear that this is what Pella *actually* did. Rather, in a letter outlining the grounds for West's discharge, Pella referenced all three of the Class 3 Corrective Action Letters Pella issued to West in the past year, two of which were issued during West's June 9 to August 25, 2014 absences. [DN 20-20 at 1.] Moreover, in that letter, Pella specifically stated that its grounds for terminating West included the fact that "receiving three corrective action letters of any class within a twelve month period will require discharge." [*Id.*] Accordingly, it appears that West's termination was "intimately intertwined" with his potentially FMLA-qualifying leave. *See Wallace*, 764 F.3d at 590 ("[W]hen the absences and cause for discharge relate directly to the FMLA leave . . . there is no legitimate and independent reason for dismissal. In this case, the purported legitimate reason is intimately intertwined with the FMLA leave, and therefore, we reject [the employer's] contention."). Here, because Pella clearly relied, in part, on West's June, July, and August 2014 absences as grounds for his termination, which may have been protected under the FMLA, the Court finds that Pella has failed to articulate a legitimate, nondiscriminatory reason at the summary judgment stage.

### (3) Pretext

For similar reasons, West has also demonstrated a genuine dispute as to whether Pella's preferred reason is pretextual. Plaintiffs can demonstrate pretext "by showing: '(1) that the [employer's] proffered reasons [for the adverse employment action] had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.'" *Parkhurst v. Am. Healthways Servs., LLC*, No. 16-6502, 2017 WL 2790684, at *3 (6th Cir. June 27, 2017) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Here, as the Court already explained above, Pella's claim that it terminated West for his February absences appears to have "not actually motivate[d]

[Pella's] action" because, as demonstrated by the discharge letter dated February 12, 2015, Pella also terminated West for his two June, 2014 Corrective Action Letters. [DN 20-20 at 1.] Accordingly, the Court finds that genuine disputes of fact exist for trial as to West's FMLA interference claim.

Nor does the Court find Pella's "honest belief" argument persuasive. The Sixth Circuit "has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 806–07 (6th Cir. 1998)). Under the honest belief doctrine, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* However, the Court does not find the honest belief rule to be applicable here. Rather, courts typically turn to that rule when an employee challenges the *factual* basis for an adverse employment decision. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (Explaining that an employee's "disagreement with the *facts* uncovered in [the employer's] investigation" into the employee's work performance did not create a genuine dispute of material fact because the employer had an honest belief in its reason for terminating the employee). Here, however, Pella does not deny that West's two June 2014 Corrective Action Letters are among the reasons he was ultimately terminated. Accordingly, that rationale does not entitle Pella to summary judgment, which the Court will deny with regard to West's FMLA interference claim.

## B. FMLA Retaliation

The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29

U.S.C. § 2615(a)(2). "An employer also violates the FMLA under the 'retaliation' theory if it takes adverse action against an employee because the employee invokes an FMLA right, rather than for a legitimate, nondiscriminatory reason." *Casagrande*, 666 F. App'x at 496 (citing *Seeger*, 681 F.3d at 282). Unlike with FMLA interference, "[a] plaintiff proceeding under a[n] [FMLA] retaliation theory must show discriminatory or retaliatory intent." *Tennial*, 840 F.3d at 308.

FMLA retaliation can also be proven under the *McDonnell Douglas* burden-shifting framework. In order for West to make out a prima facie case of FMLA retaliation, he "must show that (1) he engaged in an activity protected by the [FMLA], (2) this exercise of his protected rights was known to [Pella], (3) [Pella] thereafter took an employment action adverse to [West], and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial*, 840 F.3d at 308 (citing *Arban*, 345 F.3d at 404).

Though the Court recognizes that claims of FMLA interference are separate and distinct from claims of FMLA retaliation, the Court finds that, for many of the same reasons as the Court articulated above, genuine disputes of material fact preclude summary judgment on West's FMLA retaliation claim. With regard to the first and second elements of West's prima facie case, the Court determined above that the parties genuinely dispute whether West attempted to engage in FMLA-protected activity and whether Pella had adequate notice that West was attempting to exercise FMLA rights. Pella concedes the third element, that West's termination was an adverse employment action. [DN 20-1 at 31.]

With regard to the fourth element, Pella contends that West cannot show a causal connection "between Mr. West's alleged non-receipt of FMLA paperwork in June 2014 and his termination from employment eight months later in February 2015." [*Id.* at 32.] However, as the

Court explained above, part of Pella's grounds for terminating West were the two Corrective Action Letters he received in June, 2014, during his absence due to back issues. [DN 20-20 at 1.] Because genuine factual disputes remain as to whether Pella had notice of West's FMLA-qualifying injury, the Court finds that whether Pella retaliated against West because of it is also disputed and better left to a jury determination.

Finally, because Pella asserts the same legitimate, nondiscriminatory reason that it asserted for West's FMLA interference claim, for the same reasons as outlined above, the Court finds that justification to be insufficient. Accordingly, summary judgment will also be denied with regard to West's FMLA retaliation claim.

## CONCLUSION

Though the Court found many of the issues discussed herein to be close calls, the Court ultimately determined that the conflicting evidence on several points warrants a jury determination. Therefore, for the reasons stated herein, Pella Corporation's Motion for Summary Judgment, [DN 20], is **DENIED**.

**IT IS SO ORDERED**.

Date:

cc:     Counsel of Record