UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-154-TBR

CHARLES WEST, PLAINTIFF

v.

PELLA CORPORATION, DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Pella Corporation's Motion to Reconsider Denial of Summary Judgment, [DN 50.] Plaintiff Charles West responded, [DN 51], and Pella Corporation replied, [DN 54.] Fully briefed, this matter is now ripe for adjudication. For the reasons set out below, Pella Corporation's motion to reconsider is **DENIED**.

BACKGROUND

This matter arises out of Plaintiff Charles West's employment with Pella Corporation ("Pella") at its manufacturing plant in Murray, Kentucky. The following facts, in substantial part, are taken from the Court's previous Memorandum Opinion and Order denying Pella's Motion for Summary Judgment, [DN 47.] West was employed by Pella from March 2004 until his termination in February 2015. [DN 22-1 at 7 (West Deposition).] According to Pella, West had a history of attendance issues throughout his employment. [*See* DN 20-1 (Pella's Motion for Summary Judgment).] Most recently, in June of 2014, West injured his back at work while lifting heavy windows. [DN 22-1 at 11.] West began calling in sick for work on June 9, 2014, and continued to call in every day until he returned to work on August 26, 2014. [DN 20-11 at 2 (Jeremy Phillips Affidavit).] Each day, West stated that he could not work due to back pain or spasms. [*Id.*]

West explained in his affidavit that, by calling in every day to report that he was not feeling well enough to work, he followed the same procedure as he had during a previous absence in 2005 when he was absent due to extensive dental work related to severe gum disease. [DN 22-3 at 21 (West Affidavit.)] According to West, during this period, after he called in every day for several weeks, Pella sent West FMLA paperwork to be completed by West and his dentist. [*Id.* at 2.] In other words, West stated that he "did not ask for the paperwork, and did not know or understand that it was FMLA paperwork" related to his 2005 absences. [*Id.*]

After West injured his back in 2014, he first visited a primary care physician about two weeks after he began his absence from work. [DN 22-1 at 14–15.] That visit took place on June 26, 2014, and resulted in diagnoses of lumbago and muscle spasms. [DN 20-24.] Additionally, West's provider prescribed multiple medications. [*Id.*] After that visit, West went into Pella to provide the doctor's note from that visit to Jeremy Phillips, Pella's human resources manager. [DN 22-1 at 19–20.] According to West, at that time, Phillips provided him with contact information to apply for short-term disability benefits. [*Id.* at 20.] Though Phillips averred in his affidavit that West received both short-term disability and FMLA leave paperwork, [DN 20-11 at 2], West testified in his deposition that Phillips only told him about short-term disability, and only provided him with a phone number to call, rather than paperwork. [DN 22-1 at 18.] West did apply for short-term disability, but his application was denied because his "doctor's notes didn't cover the entire time that [he] was out" from work. [*Id.* at 20.] When asked whether West ever applied for FMLA leave during his absence, West responded "I didn't know anything about it." [*Id.* at 21.] The parties agree that West never filled out an application for FMLA leave relating to his June 9 to August 25, 2014 absences.

According to West, sometime in July, his manager, Johnny Phillips, contacted him and told him that, since he had been out from work, he needed to go back to the doctor. [*Id.* at 15–16.] On July 31, 2014, West returned to the same primary care provider he saw at his previous visit. [DN 20-25.] At that visit, West's doctor performed an x-ray, which revealed severe arthritis, in addition to his other diagnoses of degenerative disc disease and lumbago. [*Id.*; DN 22-1 at 17.] The doctor prescribed West multiple medications. [*See* DN 20-25.]

When West returned to work on August 26, 2014, he received two disciplinary letters, called "Class 3 Corrective Action Letters," related to his absence from June 9 to August 25, 2014. Both letters are dated June 25, 2014. [DN 20-13; DN 20-14.] The first Corrective Action Letter was issued due to West's failure to report for mandatory overtime on June 14 and June 21, 2014. [DN 20-13.] The second Corrective Action Letter was issued due to "excessive absenteeism" from June 9, 2014 to June 25, 2014. [DN 20-14.] Both letters warned West that "receiving three Class 3 Corrective Action Letters in a one-year period will lead to the termination of your employment." [DN 20-13; DN 20-14.] West testified that he was told to sign both letters (which he did), or that he would be terminated. [DN 22-1 at 27.]

West testified during his deposition that, after he received the two Corrective Action Letters upon his return to work on August 26, he informed Pella that he would "be on medication for the rest of [his] life" due to his back issues. [*Id.* at 44.] However, West did not discuss with Pella representatives what type of medication he was on. [*Id.* at 45.]

Pella's records indicate that West next called in sick for five consecutive workdays in February 2015. According to Pella, West called in sick on February 4, 5, 6, 9, 10, and 12. [DN 22-1 at 29–30.] West's manager at that time, Tony Robinson, stated that, each day West called in on February 4, 5, and 6, that West requested vacation for those days. [*Id.* at 30.] Robinson stated

that he approved West for vacation, but that on the third day, he charged West with an attendance incident for failing to request the vacation in advance as required by Pella's policy. [*Id.* at 31.] Pella next claims that West called in sick on February 9 and 10 after he ran off the road and his truck got stuck in the mud. [*Id.* at 31–32.] Finally, Pella's records indicate that West also called in sick on February 12, 2015 for "personal business." [DN 20-20.]

West agrees that he called in sick on February 9 when his truck was stuck, but denies ever calling in sick on February 4, 5, 6, 10, or 12. [*Id.* at 30–32.] According to West, he "was only out one day" in February. [*Id.* at 33.] According to Phillips, on February 10, 2015, West was formally counseled over the phone about his absences and tardiness at work. [DN 20-11 at 3.] West testified that he could not recall this phone conversation ever taking place. [DN 22-1 at 35–36.] West agreed, however, that after he was absent for his truck breaking down, Pella called to inform him that he was suspended for absenteeism. [*Id.* at 37–38.] According to West, he was already suspended before February 12, 2015, when Pella claims West called in sick due to "personal business." [DN 22-1 at 41.]

Pella sent West a letter via certified mail dated February 12, 2015 stating that West received a third Class 3 Corrective Action Letter on February 12, 2015 for "excessive absenteeism/tardiness' and that he was discharged from employment at Pella that same day for receiving three Class 3 Corrective Action Letters in a twelve month period. [DN 20-20.] According to Pella, Jeremy Philips met with West on February 13, 2015 to discuss his attendance issues. [DN 20-11 at 4.] Philips states that he asked West whether "there was an underlying reason for the absences that [Pella] could address though Pella's employee assistance program, and Mr. West answered no and mentioned that his absences were caused by 'other stuff that keeps happening.'" [*Id.*]

Under Pella's Attendance Policy, unexcused absences constitute "occurrences," and the time employees miss from work count toward the calculation of an "absenteeism rate %." [DN 20-5 at 1.] Pella's Policy explains that an employee's attendance record will be considered "unacceptable" when an employee incurs four or more occurrences or has an absenteeism rate of 2% or higher, whichever occurs first in a rolling twelve-month period. [*Id.* at 2.] According to Pella, because West's attendance record violated its attendance policy, and because West received three Class 3 Corrective Action Letters in a one-year period, it determined that West was properly terminated under the progressive discipline process outlined therein. [DN 20-11 at 5.] Pella sent a termination letter to West on February 18, 2015 formalizing his February 12, 2015 discharge. [*Id.*]

West later brought suit against Pella asserting claims of FMLA interference and FMLA retaliation. [DN 15 (First Amended Complaint).] In a Memorandum Opinion and Order dated October 20, 2017, the Court denied Pella's motion for summary judgment as to both of those claims. [DN 47.] Thereafter, Pella filed the instant motion to reconsider, [DN 50.]

STANDARD

Although the Federal Rules of Civil Procedure do not provide expressly for "motions for reconsideration," Pella's instant motion seeks relief under Federal Rule of Civil Procedure 54(b), which provides that

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). Indeed, the Court has "inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *Mallory v. Eyrich*, 922 F.2d

1273, 1282 (6th Cir. 1991) (citing *Marconi Wireless Telegraph Co. v. United States,* 320 U.S. 1, 47–48 (1943)). Further, "district court[s] may modify, or even rescind, such interlocutory orders." *Id.* (citing *Simmons Co. v. Grier Brothers Co.,* 258 U.S. 82, 88 (1922)). Here, because the Court did not direct final judgment in its prior Memorandum Opinion and Order denying Pella's motion for summary judgment, Rule 54(b) is applicable to Pella's motion to reconsider that decision.

DISCUSSION

In its motion for reconsideration, Pella argues that the Court made three main errors which merit reconsideration. The Court will address each of these arguments in turn.

**(1) Medical Records**

First, Pella contends that the Court erroneously relied, in part, on West's July 31, 2014 medical records as evidence that Pella could have had notice of West's FMLA-qualifying condition when, in actuality, those records were never provided to Pella. [DN 50-1 at 2.] In its prior Memorandum Opinion, the Court discussed two doctor visits and accompanying medical documents. First, West visited the doctor on June 26, 2014. [DN 20-24.] His medical records from the June 26 visit indicate that he could "get onto [the] exam table without difficulty," identified his diagnoses as lumbago and spasm of muscle, noted that his doctor prescribed him various medications, and stated that he should be off work on June 27 and 28, but that he could return on June 30. [DN 20-24 at 2.] Pella agrees that West provided his June 26, 2014 medical records to Pella. [*See* DN 50-1 at 3 (Arguing that "West only provided medical information twice – the medical record in June and his July note.").]

The parties agree that, after West continued to miss work following the June 26 doctor visit, "Pella spoke to Mr. West after the absences and encouraged him to return to the doctor and

try to secure documentation for his unexcused absences." [DN 54 at 9.] This led to West's second doctor visit on July 31, 2014. During that visit, West's doctor performed an x-ray, which revealed new diagnoses of severe arthritis, degenerative disc disease and lumbago. [DN 20-25 at 2.] The doctor prescribed West with multiple medications and explained to him that "this will be a chronic condition that will flare up from time to time." [*Id.* at 3.] In its Memorandum Opinion, the Court concluded that, based on West's June 26 and July 31 doctor visits and accompanying medical records, West suffered from a chronic "serious health condition" such that he was eligible for FMLA leave. [DN 47 at 12.] In its motion to reconsider, Pella does not ask that the Court reconsider this determination. Rather, it requests that the Court reconsider its finding that genuine disputes of material fact exist as to whether Pella had sufficient *notice* of West's FMLA-qualifying condition and intent to take FMLA leave, as is required by the fourth element of a prima facie case for FMLA interference. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 427 (6th Cir. 2014) (citing *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 506 (6th Cir. 2006)).

In its motion to reconsider, Pella argues that West never provided it with his July 31, 2014 medical records, which contained Pella's diagnoses of SI joint arthritis, degenerative disc disease, and the description of his injuries as "chronic." [DN 50-1 at 2.] According to Pella, all West provided it with after the July 31 doctor visit was a boilerplate note that stated "This is to certify that Charles L West is under the care of Susan Heffley MD and will be absent from school/work today. Charles L West will be able to return to work/school on 8/4/14." [DN 20-12.] Pella contends that "there is no dispute that Mr. West never provided the July 31, 2014, medical records to Pella." [DN 50-1 at 2.]

In his response to Pella's motion to reconsider, West contends that "that fact *is* disputed." [DN 51 at 2.] West does acknowledge that he never gave the July 31 medical records directly to Pella. [*Id.* at 2–3.] However, West argues that, because he gave copies of both the June 26 and July 31 medical records to Pella's third party administrator of short term disability benefits, Matrix Absence Management, Inc. ("Matrix"), Pella, by extension, had access to all of those records. [*Id.*] In support of this argument, West argues that he also never presented his June 26 medical records directly to Pella, but that Pella must have accessed those records by obtaining them through Matrix. [*Id.*] In making this argument, West asks the Court to take judicial notice of a portion of Matrix's website which allegedly addresses Matrix's clients' ability to access information related to their employees' claims for medical leave. [*Id.* at 2.]

Pella opposes West's arguments in its reply, pointing first to Federal Rule of Evidence 201, which "governs judicial notice of an adjudicative fact only." Fed. R. Evid. 201(a). Rule 201(b) provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: **(1)** is generally known within the trial court's territorial jurisdiction; or **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201 (b)(1)–(2). According to Pella, an inference that Pella saw West's July 31 medical records cannot be accurately and readily determined merely from a page on Matrix's website generally discussing how Matrix provides disability claim information to its employer-clients. The Court agrees. Under Rule 201(b)(2), the subsection applicable in this situation, judicial notice is proper only in circumstances in which a fact "can be accurately and readily determined" from the source at issue. Here, the page on Matrix's website titled "Clients: Employer Services," vows to provide employers with "up to date claim information and reports online." *Clients: Employer Services*, Matrix Absence Management,

http://www.matrixcos.com/clients.html (last visited Jan. 8, 2018). It further explains that Matrix's "eReports" feature allows "clients [to] have access to a wide variety of claim and leave related data, which allow users to perform a range of business functions including bank account reconciliation, claims experience and performance, loss analysis and intermittent leave tracking." *Id.* Nowhere on the webpage however, does it provide that employers have access to its employees' medical records that an employee submits to Matrix in support of its leave claim. Accordingly, it is cannot "be accurately and readily determined" from this website that Pella had access to all of West's medical records, including his July 31 records. Therefore, the Court will not take judicial notice of the Matrix webpage.

Furthermore, West does not submit any deposition excerpts, affidavits, or declarations either from himself or another witness to support a finding that Pella had access to his medical records through Matrix. In contrast, Pella attached to its reply the declaration of Jeremy Phillips, the Human Resources Manager at Pella during all times relevant to this litigation. [DN 54-1.] Therein, Phillips declares that he has "full knowledge of Pella's human resources files and record systems, including Pella's interaction with third-party vendors." [*Id.* at 1.] Phillips further states that he "can confirm that no one at Pella had (or has) any ability to access Mr. West's medical records submitted to Matrix. Pella does not have any login or password to the Matrix website or any other means of accessing such records. This was true in 2014-2015, and it remains true today." [DN 54-1 at 2.] Because West did not submit any evidence to contradict this statement, this fact is not genuinely disputed.

Notwithstanding Pella's lack of access to the July 31, 2014 medical records, however, the Court still finds that a trier of fact could determine that Pella had notice of West's FMLA-qualifying condition such that he intended to take FMLA leave. As the Court explained in its

prior Memorandum Opinion, "[t]he employee's burden is not heavy" with regard to giving an employer such notice. *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014)). Rather, "the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). In *Reeder v. County of Wayne, Michigan*, for instance, the Sixth Circuit explained the employee and employer's duties in detail as follows:

> An employee need not expressly assert rights under the FMLA, but will be deemed to have given the employer sufficient notice by providing information from which the employer can reasonably conclude that an FMLA-qualifying circumstance is in play. Once the employee has met this low threshold requirement, it is incumbent on the employer—if more information is needed to determine whether the condition is FMLA-qualifying—to require, *by written notice*, certification by a health-care provider. This written notice must also include notice of the consequences of an employee's failure to provide adequate certification. Further, if the employee provides incomplete certification, the employer shall so advise the employee and "shall state in writing what additional information is necessary." 29 C.F.R. § 825.305(c).

694 F. App'x 1001, 1006 (6th Cir. 2017) (citing *Wallace*, 764 F.3d at 586–88; 29 C.F.R. § 825.305(c)). The key question in *Reeder*, as in this case, is "whether [plaintiff] provided the [employer] sufficient information to trigger its obligation to give him written notice of his need to provide adequate medical certification, and of the consequences of failing to do so." *Id.* at 1006.

In this case, the parties agree that Pella, through West's manager, Johnny Phillips, told West to return to the doctor after he continued to be absent from work following his June 26 appointment. Indeed, in its reply, Pella emphasizes that it "instructed Mr. West to go back to the doctor to try to obtain additional documentation – the exact opposite of any intent to write up Mr. West unfairly." [DN 50-1 at 13.] West did as Pella requested and visited his doctor a second time on July 31, 2014. When asked during his deposition whether West "follow[ed] up with Mr. Phillips regarding [his] second visit to the Primary Care as he directed," West responded that he "took in [his] doctors' note to him." [DN 20-8 at 6.] West explained that "[t]here was no

discussion," but rather Mr. Phillips "said, 'Do you have your note?'", and West simply handed it to him. [*Id.*]

In the Court's view, the very fact that Phillips instructed West to return to the doctor to obtain medical documentation for his absences is "sufficient to create a jury question as to whether [West] met his 'notice of intention' burden" such that "he provided sufficient information to put [Pella] on notice of its duty to inquire further about whether FMLA leave was being sought." *Reeder*, 694 F. App'x at 1007. The regulations make plain that an employer, "if more information is needed to determine whether the condition is FMLA-qualifying," must specifically inform an employee of the need to complete a medical certification, the consequences of failing to do so, and, if applicable, what information is missing from an incomplete certification. *Id.* at 1006. Though Pella did instruct West to return to the doctor, it does not appear that it told him to obtain a certification from his health care provider, nor that it supplied him with a form in anticipation of that visit. There is also no evidence that Pella advised West of the consequences of failing to bring a completed certification or adequate medical documentation following his July 31 visit. Finally, there is no evidence that Pella advised West that the generic note West did provide it with following his July 31 visit was inadequate or what additional information was necessary. *See id.*

Taking all of these facts together, the Court finds that, even without the medical records pertaining to West's July 31 doctor appointment, the fact that West repeatedly called in sick due to back injury, provided Pella with his June 26 medical records, and the fact that Pella instructed West to return to the doctor to obtain further documentation combine to create a an issue of fact as to whether Pella had notice of West's intention to take FMLA leave. The Court acknowledges that many of the issues surrounding this determination present close calls. However, at this time,

viewing the record in record in the light most favorable to West, the Court believes that a genuine dispute exists for trial.

Pella urges the Court that *McClure v. Comair, Inc.* compels an opposite conclusion to the one the Court reaches here. In that case, the District Court for the Eastern District of Kentucky concluded that the "[p]laintiff has failed to establish that her back spasms constituted a 'serious health condition' because she has not proven that her condition rendered her unable to perform the functions of her job." *McClure v. Comair, Inc.*, No. CIV.A. 04-107-DLB, 2005 WL 1705739, at *5 (E.D. Ky. July 20, 2005). However, the *McClure* court's analysis hinged on its determination that McClure did not prove that she suffered from a serious health condition rather than a failure to satisfy the notice requirement, as in West's case. In fact, the *McClure* court, like this Court, determined that disputed issues of fact existed as to whether McClure gave adequate notice of her need for leave to her employer. *Id.* at *4. Specifically, the court explained that "there are several issues regarding the adequacy of Plaintiff's notice, including: 1) when Plaintiff gave notice, 2) the substance of the notice, and 3) to whom notice was given. On those bases, summary judgment will be denied." *Id.* As the Court explained above, many of these same notice issues are present in this case. Though the *McClure* court ultimately granted summary judgment on the grounds that McClure had not proven a serious health condition, that circumstance does not exist here, where the Court has already concluded that West *did* suffer from a serious health condition. [DN 47 at 12.] Thus, Pella's reliance on *McClure* is unpersuasive.

**(2) Legitimate, Nondiscriminatory Reason and Pretext**

Second, Pella asserts that the Court applied an incorrect standard for determining whether Pella met its burden of identifying a legitimate, nondiscriminatory reason for terminating West's employment. [DN 50-1 at 8.] In its motion for summary judgment, Pella proffered a legitimate,

nondiscriminatory reason for terminating West. There, Pella stated, on pages fourteen and fifteen of its motion, that:

> Pella thoroughly establishes a legitimate, nondiscriminatory basis for its termination decision: Mr. West's violations of the Attendance Policy. As fully documented above, Mr. West was absent from work on February 4, 5, 6, 9, 10, and 12th, which made him subject to termination, even though he used vacation days to cover February 4, 5, and 6. Policy violations have repeatedly been held to constitute legitimate, nondiscriminatory bases for employment decisions.

[DN 20-1 at 14–15.]

For every subsequent claim Pella addressed in its motion (West initially brought six), Pella stated that it "refers to and incorporates above analysis of its legitimate, nondiscriminatory basis for Mr. West's termination." [DN 19, 27, 32, 35.] Accordingly, while Pella argues in its motion for reconsideration that it has never argued that it could have legitimately terminated West based solely on his February 2015 absences, the Court disagrees, based on the above quotations to Pella's motion for summary judgment.

In the Court's prior Memorandum Opinion, the Court found Pella's proffered reason relating to solely the February absences to be insufficient, first, because whether West indeed missed each of the days in February was genuinely disputed. [DN 47 at 16–17.] Next, the Court reasoned that, "though Pella claims it could have legitimately terminated West based solely on his February absences, it does not appear that this is what Pella *actually* did." [*Id.* at 18.] Rather, the Court pointed to West's termination letter, which referenced all three of the Class 3 Corrective Action Letters Pella issued to West in the year preceding his termination, two of which were issued during West's June 9 to August 25, 2014 absences. [DN 20-20 at 1.]

Pella argues that the Court's analysis of Pella's legitimate, nondiscriminatory reason was error, however, because an employer's burden at the summary judgment stage is merely to produce a legitimate, nondiscriminatory reason, not to actually *persuade* the Court that the

reason, in fact, motivated the employer's decision. [DN 50-1 at 8–9.] Pella is correct in this regard. The Supreme Court has made clear that, after a plaintiff makes out his prima facie case, "[t]he burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *The defendant need not persuade the court that it was actually motivated by the proffered reasons*." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The employer's burden is merely a "burden of production." *Id.* at 255. If the employer successfully carries this burden, "the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56.

Upon closer examination, it appears that Pella is correct that the Court conflated the third and fourth steps of the *McDonnell Douglass* analysis. In its Memorandum Opinion, the Court concluded that Pella's proffered reason was insufficient because it did not appear, based on West's termination letter, that Pella actually did terminate him solely on the basis of his February 2015 absences. Pella is correct that this determination was improper at the third step of the *McDonnell Douglass* analysis. Rather, it must be reserved for the fourth step. The fourth step provides that a plaintiff may demonstrate pretext "by showing: '(1) that the [employer's] proffered reasons [for the adverse employment action] had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.'" *Parkhurst v. Am. Healthways Servs., LLC*, No. 16-6502, 2017 WL 2790684, at *3 (6th Cir. June 27, 2017) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Therefore, the Court's reasoning that the February absences, alone, did not actually appear to motivate Pella's decision to terminate West must go only to its pretext analysis. However, because that analysis is still valid, just under the fourth prong rather than the

third, the Court stands by its initial reasoning, with the acknowledgement that its analysis must be directed only towards the pretext phase of the *McDonnell Douglass* test.

In its motion for reconsideration, however, Pella states that it

> has consistently argued that it terminated Mr. West on the basis of [the] 2014 and 2015 absences together over a twelve-month period. Pella first articulated the reason generally as "Mr. West's violations of the Attendance Policy," see DE #20-1 at 14-15, which is exactly correct because Mr. West received three Class 3 Corrective Action Letters for attendance issues in a twelve-month period. Consistent with the express language of the Corrective Action Letters, Pella further explained that the February 2015 absences triggered the termination.

[DN 50-1 at 11.] Thus, according to Pella, its legitimate, nondiscriminatory reason for terminating West's employment included his June, July, and August 2014 absences *together* with his February 2015 absences, as those events culminated in three Corrective Action Letters in one twelve-year period which, under Pella's policy, is grounds for terminations. However, the Court already addressed this proffered reason in its prior Memorandum Opinion. There, the Court explained that, to the extent Pella claims it terminated West based, in part, on his 2014 absences, which may have been FMLA-qualifying, that reason is "intimately intertwined" with West's potentially FMLA-qualifying leave. *See Wallace*, 764 F.3d at 590 ("[W]hen the absences and cause for discharge relate directly to the FMLA leave . . . there is no legitimate and independent reason for dismissal. In this case, the purported legitimate reason is intimately intertwined with the FMLA leave, and therefore, we reject [the employer's] contention."). Here, because Pella clearly relied, in part, on West's June, July, and August 2014 absences as grounds for his termination, which may have been protected under the FMLA, genuine disputes remain as to whether West's 2014 absences can serve as a legitimate, nondiscriminatory reason for his termination at the summary judgment stage. If a jury ultimately determines that Pella did not have adequate notice of West's alleged need for FMLA leave during his 2014 absences, this

reason may prove legitimate. However, at this stage, that reason is intimately intertwined with genuinely disputed facts regarding West's 2014 absences. Because Pella's proffered reason that it terminated West for both his 2014 and 2015 absences involves disputed issues of fact, the question of whether it is legitimate must be sent to the jury. Therefore, at this time, West need not show that this proffered reason is pretext.

**(3) Honest Belief Doctrine**

Finally, Pella argues that the Court misapplied the honest belief doctrine. As the Court explained in its Memorandum Opinion, the Sixth Circuit "has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 806–07 (6th Cir. 1998)). Under the honest belief doctrine, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* The Court previously reasoned that the honest belief rule is not applicable to Pella's legitimate, nondiscriminatory reason, and it stands by that reasoning here. Courts typically apply the honest belief doctrine when an employee challenges the *factual* basis for an adverse employment decision. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (Explaining that an employee's "disagreement with the *facts* uncovered in [the employer's] investigation" into the employee's work performance did not create a genuine dispute of material fact because the employer had an honest belief in its reason for terminating the employee based on those facts). Here, Pella agrees that it terminated West, in part, based on his two 2014 Corrective Action Letters. Whether or not Pella had an honest belief that those Corrective Action Letters were *warranted*, it may ultimately prove that West's 2014

absences were FMLA-qualifying, and therefore that termination based on those two Letters was discriminatory. Accordingly, the honest belief doctrine does not entitle Pella to summary judgment.

## CONCLUSION

The Court acknowledges that several of the determinations at the summary judgment stage of this case present exceedingly close calls. Moreover, the numerous factual disputes between the parties relating to the various steps of the *McDonnell Douglass* test make several of the issues complicated. However, even upon reconsideration of each of these issues, the Court finds that Pella's motion for summary judgment is properly denied. Accordingly, Pella's motion for reconsideration, [DN 50], is **DENIED**.

**IT IS SO ORDERED**.

Date: January 9, 2018

cc: Counsel

**Thomas B. Russell, Senior Judge**
**United States District Court**